[678 NYS2d 674]

MARY T. BERRY, Individually and as Conservator of the Property of CORNELIUS M. BERRY, Conservatee, Appellant-Respondent, and LUCENT TECHNOLOGIES, INC., as Successor to AT&T, et al., Proposed Intervenors-Respondents-Appellants, v ST. PETER's HOSPITAL OF THE CITY OF ALBANY, Defendant, and VIRGINIA M. LAZARO et al., Appellants-Respondents.

Third Department, October 8, 1998

APPEARANCES OF COUNSEL

*Harvey & Harvey, Harvey & Mumford,* Albany (*Brian F. Mumford* of counsel), for Mary T. Berry, appellant-respondent.

*Martin, Ganotis, Brown, Mould & Currie, P. C.,* DeWitt (*Charles Patton* of counsel), for Virginia M. Lazaro, appellant-respondent.

*Carter, Conboy, Case, Blackmore, Napierski & Maloney, P. C.,* Albany (*Gregory S. Mills* of counsel), for Dennis Gort, appellant-respondent.

*Thorn & Gershon,* Albany (*Paul J. Catone* of counsel), for Patrick A. Fantauzzi and others, appellants-respondents.

*Hinman, Straub, Pigors & Manning, P. C.,* Albany (*Kimberly C. Lawrence* of counsel), for Lucent Technologies, Inc., proposed intervenor-respondent-appellant.

*Moran & d'Arcambal,* New York City (*Michelle J. d'Arcambal* of counsel), for Metropolitan Life Insurance Company, proposed intervenor-respondent-appellant.

## OPINION OF THE COURT

CARPINELLO, J.

The basic facts leading up to the subject appeal are not in dispute. In September 1983, Cornelius M. Berry (hereinafter Berry) was a 41-year-old Capitol Police Officer for the State when he became ill and was admitted to defendant St. Peter's Hospital of the City of Albany for diagnostic tests, which included a fiber-optic bronchoscopy. Anesthetized during this procedure, Berry suffered a cardiac arrest and a protracted period of insufficient blood oxygen resulting in irreparable brain damage. For the past 15 years, Berry has been in a coma and remains a patient at St. Peter's Hospital with around-the-clock nursing care where he is sustained by a respirator and feeding tube.

Plaintiff, Berry's wife, was appointed his conservator in March 1985. In this capacity, she commenced this medical malpractice action in March 1986 seeking damages for, *inter alia*, Berry's pain and suffering, as well as his medical and hospital expenses. As a State employee, Berry was insured

under the Empire Plan which is administered by Metropolitan Life Insurance Company (hereinafter Met Life). Berry was also a named insured on plaintiff's health insurance policy through her employer; such coverage is now provided by Lucent Technologies, Inc. (hereinafter Lucent). Under these policies, Met Life and Lucent have paid out approximately $1.75 million and $1.8 million, respectively, for Berry's medical expenses. These companies have both asserted claims in legal and equitable subrogation as to any medical expenses recovered by plaintiff.[1]

In 1995, plaintiff's claim against St. Peter's Hospital was settled pursuant to a sealed, court-approved agreement which reportedly earmarked the settlement as payment for lost income and pain and suffering without including any amount for medical expenses.[2] Neither Met Life nor Lucent were notified of or participated in that settlement.

After a June 2, 1997 trial date was set, Met Life and Lucent (hereinafter collectively referred to as the intervenors) sought to intervene in the suit against the remaining defendants[3] to prevent a settlement or jury verdict detrimental to their subrogation interests. Intervention was opposed by all parties. Supreme Court denied the motions to intervene as of right under CPLR 1012 but granted the motions to intervene by permission pursuant to CPLR 1013. The court found that "[t]he intervenors have all rights and obligations of original parties with respect to any settlement of this action", including veto power; however, the court noted that "[t]he role of the intervenors at trial will be limited to the protection of their rights via the offering of evidence of the medical payments made on Berry's behalf, or to be made in the future, if plaintiff fails to offer such evidence" (173 Misc 2d 214, 226). Plaintiff and defendants appeal. The intervenors cross-appeal from that part of Supreme Court's order denying intervention as of right under CPLR 1012.

1. In 1991, plaintiff filed a separate action in United States District Court seeking to compel Lucent and Met Life to pay for private-duty nursing services for Berry. The insurers, having determined that continued acute hospital care was not medically indicated and that Berry should be transferred to a skilled nursing facility, have since terminated *all payments* for Berry's medical care. As part of that case, they counterclaimed for the payments they had made for Berry's hospitalization.

2. Plaintiff alleges that Berry retains sufficient cognitive awareness to sustain a claim for nonpecuniary damages (*see generally*, *McDougald v Garber*, 73 NY2d 246).

3. The causes of action against defendants Teresa S. Briggs, Igal Zuravicky and Capital District Cardiology were discontinued by stipulation.

Plaintiff and defendants maintain that Supreme Court abused its discretion by granting the intervenors' motion for permissive intervention pursuant to CPLR 1013. This statutory provision provides: "Upon timely motion, any person may be permitted to intervene in any action * * * when the person's claim or defense and the main action have a common question of law or fact. In exercising its discretion, the court shall consider whether the intervention will unduly delay the determination of the action or prejudice the substantial rights of any party" (*id.*). In examining these criteria, we recognize that the intervenors' claims for reimbursement of the medical expenses paid on Berry's behalf share common questions of law and fact with plaintiff's medical malpractice action. The amended complaint specifically states in the first cause of action that, due to defendants' alleged negligence, Berry "was required to incur and did incur expenses for hospitalization and medical treatment and care" and that such expenses would "continue in the future". Nevertheless, in examining the remaining factors pursuant to CPLR 1013, we are persuaded that granting permissive intervention was an abuse of discretion under the circumstances of this case.

With respect to the issue of potential delay, we are unconvinced by the intervenors' argument that their participation in this proceeding would cause only minor inconvenience to the parties, even assuming that their participation at trial was limited to presenting proof of past and future medical expenses. Since there is already a bitter dispute between plaintiff and the intervenors over the reasonableness of the costs incurred—as evidenced by the intervenors' present refusal to pay for continued medical expenses—there is every reason to believe that these costs would be a hotly contested issue at trial, adding to the delay and complexity of the litigation (*see, Humbach v Goldstein*, 229 AD2d 64, 68, *lv dismissed* 91 NY2d 921). Although the intervenors deny such a dispute, they can hardly argue at the trial in this action that the costs incurred to date were medically indicated and reasonable and then advocate the opposite in the Federal action.

More significantly, the intervenors' presence at any settlement discussions will clearly be prejudicial to plaintiff since the amount of malpractice insurance available to the remaining defendants appears to be significantly less than the amount of damages plaintiff may be able to recover at trial. Indeed, plaintiff may choose to accept a settlement and have a good-faith basis for allocating it to an element of damages that does

not include medical expenses. Supreme Court granted the intervenors veto power over such a settlement. These prejudicial effects should not be ignored in the interest of promoting the competing policy of judicial economy. Such prejudice constitutes the overriding reason for our decision to reverse.

The public interest in assuring the integrity of relations between insurers and their insureds requires that even the potential for conflict of interest in these situations be avoided and militates against allowing an insurer to, directly or indirectly, place its own interests above those of its insured (*see, Pennsylvania Gen. Ins. Co. v Austin Powder Co.*, 68 NY2d 465, 472). We agree with the Second Department that "[t]he intervention of various medical providers could create an adversarial posture between carriers and plaintiffs" (*Humbach v Goldstein, supra*, at 68; *see, McGuire v Long Is. Jewish-Hillside Med. Ctr.*, 237 AD2d 417, *lv dismissed* 91 NY2d 922), a posture which we view as antithetical to the fundamental nature of the relationship between an insured and his or her insurer.

Both plaintiff and Berry were promised, as incidents of their employment, health insurance coverage which they understood would indemnify them for certain medical expenses. The intervenors agreed to provide such coverage with the knowledge that, in some instances, sums expended for medical care of the insureds *might* be recovered from third-party tortfeasors. They assumed the risk, however, that not all such expenses would be so recovered.[4] And, we venture to say that at the beginning of the insurer/insured relationship neither plaintiff nor Berry ever anticipated that their health insurance carriers would be their adversaries under these circumstances. As noted by the Court of Appeals: "The insurer cannot share in proceeds the insured has obtained from a third party * * * when the insured has not been made whole. Only if the insured's recovery exceeds its loss can the insurer share in the excess proceeds * * *. The rule is based upon the nature of the relationship between the insurer and the insured—if the loss of one of the two must go unsatisfied, it should be the insurer who has been paid to assume the risk of loss" (*Winkelmann v Excelsior Ins. Co.*, 85 NY2d 577, 583 [citations omitted]). In *Winkelmann v Excelsior Ins. Co.* (*supra*), the Court of Appeals

---

4. This situation contrasts with that involving the provision of public funds to needy recipients where the Legislature grants an actual *lien* which attaches to any verdict or settlement in a third-party lawsuit (*see, e.g., Cricchio v Pennisi*, 90 NY2d 296, 306; *see also*, Workers' Compensation Law § 29 [similar statutory lien for workers' compensation benefits]).

allowed the insurer to sue the tortfeasor directly on its subrogation rights only because the "[p]laintiffs may yet recover the balance of their losses [from the tortfeasor]" (*id.*, at 580) and the insurer "has not [yet] caused its insureds any damages" (*id.*, at 581).

The Court of Appeals has long permitted the application of "the general rule" that an insurer which has paid part of a loss may proceed to enforce its rights of subrogation against a third-party tortfeasor, but only where the insured's rights are in no way diminished. "[I]t is an application of the established principle that subrogation is designed 'to dispense equity and justice among the parties' * * * and should not be permitted where that result will not be achieved" (*Federal Ins. Co. v Andersen & Co.*, 75 NY2d 366, 376, quoting *Seely's Son v Fulton-Edison, Inc.*, 52 AD2d 575, 578 [citations omitted]). In the case at bar, there is adequate evidence in the record that the liability coverage of the remaining defendants is substantially less than the total possible provable damages. Supreme Court was clearly presented with a situation where the potential existed that "the sources of recovery ultimately available [might be] inadequate to fully compensate the insured[s] for [their] losses", such that the intervenors—who have "been paid * * * to assume the risk of loss—[have] no right to share in the proceeds of the insured[s'] recovery from the tortfeasor" (*Winkelmann v Excelsior Ins. Co.*, *supra*, at 581). Under these circumstances, Supreme Court improvidently exercised its discretion in permitting intervention and placing the intervenors' interests in conflict with those of their insureds.

Supreme Court relied upon the Court of Appeals recent decision in *Teichman v Community Hosp.* (87 NY2d 514) to justify its holding that the intervenors had a clear right to interject themselves into any settlement negotiations and veto any result that was not favorable to their interests. We find nothing in the case to support this proposition. In *Teichman*, the Court merely allowed the insurer to intervene to determine *whether* compensation for medical expenses was actually included in a settlement stipulation. At no point does the Court give permission to the insurer to invalidate the settlement in the event such compensation is not found, nor does it direct that the issue be considered de novo. Moreover, we find no implication in *Teichman* that the failure to allocate a portion of the settlement to medical expenses would justify vitiating same. In our view, the remedy granted by Supreme Court, particularly veto power over any settlement, strikes at the

heart of the relationship between insureds and insurers and impermissibly allows the latter to dictate the course of the litigation.[5] With respect to the issue of whether the intervenors' interests would be unduly prejudiced if they are not allowed to intervene, we need only say that their rights under subrogation must defer to their primary obligations to their insureds.[6]

Finally, we are unpersuaded that Supreme Court erred in denying the intervenors' motions pursuant to CPLR 1012, which permits intervention as of right "[w]hen the representation of the person's interest by the parties is or may be inadequate and the person is or may be bound by the judgment" (CPLR 1012 [a] [2]). Notwithstanding the apparent mandatory nature of the statute, the court still enjoys a measure of discretion in determining whether the relief should be granted dependant upon a showing that intervention would not prejudice any of the rights of the existing parties (*see*, 3 Weinstein-Korn-Miller, NY Civ Prac ¶ 1014.02; Alexander, Practice Commentaries, McKinney's Cons Laws of NY, Book 7B, CPLR C1012:5, at 159). Accordingly, we deem our preceding analysis of prejudice under CPLR 1013 equally applicable to the propriety of intervention under CPLR 1012.

Due to our resolution of the intervention issue, it is unnecessary to consider the remaining issues, including the doctrine of laches and Supreme Court's application of the "relation back" doctrine in determining the issue of the Statute of Limitations.

MERCURE, J. P., PETERS, SPAIN and GRAFFEO, JJ., concur.

Ordered that the order is modified, on the law and facts, without costs, by reversing so much thereof as granted the mo-

---

**5.** In contrast to the case at bar, the amount of the medical expenses at issue in *Teichman* ($169,302.27) was insignificant in comparison to the settlement ($4,500,000) and the plaintiff was able to effect the settlement prior to the insurer's intervention (*see also*, *Niemann v Luca*, 168 Misc 2d 1023 [intervention granted prior to settlement in part because none of the parties opposing the insurer's motion demonstrated prejudice]).

**6.** On this issue, we note that the Second Department in *Humbach v Goldstein* (229 AD2d 64, *supra*) held that insurers would not be prejudiced by a denial of the right to intervene because CPLR 4545 barred their right to recovery after trial (*but see*, *Kelly v Seager*, 163 AD2d 877; *Nossoughi v Federated Dept. Stores*, 175 Misc 2d 585). As noted by the Second Department, the fact that this statute, which was enacted to bar double recoveries to victims, in effect shifts the costs of medical expenses from liability carriers to health insurers, is a matter best left to the Legislature.

tions by the proposed intervenors for permission to intervene pursuant to CPLR 1013; said motions denied; and, as so modified, affirmed.