Rick MALLETTE, Plaintiff,

v.

MARINEMAX, INC., MarineMax East, Inc., MarineMax Northeast, LLC, MarineMax Services, Inc., and Surfside 3 Yacht Clubs, LLC, Defendants.

No. 08–cv–1606 (ADS)(ETB).

United States District Court, E.D. New York.

April 22, 2011.

Rubin, Fiorella & Friedman LLP, by Brendan M. Burke, Jr., Esq., James Edward Mercante, Esq., Patrick Corbett, Esq., Michael Evan Stern, Esq., of Counsel, New York, NY, for plaintiff.

Hill Betts & Nash LLP, by James Edward Forde, Esq., of Counsel, New York, NY, for MarineMax Defendants.

No Appearance, Surfside 3 Yacht Clubs, LLC.

## MEMORANDUM OF DECISION AND ORDER

SPATT, District Judge.

The plaintiff in this case owned a boat that was severely damaged in a fire at a marina operated by the defendants MarineMax, Inc., MarineMax East, Inc., MarineMax Northeast, LLC, and MarineMax Services, Inc. (the "MarineMax Defendants") in Lindenhurst, New York. The plaintiff brought the present case seeking to recover the value of the damage to his boat. Both the plaintiff and the MarineMax Defendants now move for summary judgment. For the reasons that follow, the Court denies both parties' motions.

## I. BACKGROUND

The Court previously discussed the background to this case in *Falcone v. MarineMax, Inc.*, 659 F.Supp.2d 394 (E.D.N.Y. 2009) (*"MarineMax I"*, issued September 17, 2009). Familiarity with that decision is assumed. Since the Court issued *MarineMax I,* there have been two significant changes to the contours of this case: (1) three of the previous plaintiffs, Angelo Falcone, James Koppel, and Partricia Schneider, dismissed their claims against all of the defendants, and (2) the MarineMax Defendants dismissed all of their claims against the previously-named third party defendants, Marinco Electrical Group and Seacoast Distributors, LLC. Therefore, the only claims that now remain pending are those of the plaintiff Rick Mallette against the original defendants. The case is before the Court based on the Court's admiralty jurisdiction.

On May 9, 2007, there was a fire aboard a fifty-foot long motor-driven yacht owned by former-plaintiff Angelo Falcone. While the MarineMax Defendants have not expressly accepted any description of the events that occurred on May 9, 2007, the following details surrounding the fire are not in genuine dispute: On May 9, 2007 about 6:40 p.m., a fire started on a swim platform at the aft starboard side of Angelo Falcone's boat while it was docked at the marina operated by the MarineMax Defendants. Forensic evidence showed that Falcone's boat had been plugged in to receive electric power from an outlet on the dock, using two 50–amp capacity extension cords. The first cord was plugged into the back of Falcone's boat on the back port side, and ran to a swim platform on the aft starboard side of the boat, where the remaining unused length of the cord was left coiled. A second electrical cord was then plugged in to the end of the cord coiled on the swim platform, and ran to an outlet on the marina dock. The connection between the two power cords rested with the coiled cord on the swim platform of Falcone's boat. There is essentially no dispute that the fire started from the connection between these two power cords.

According to the plaintiff, because the connection between the two power cords was left on the swim platform of Falcone's boat, the connection became submerged in seawater at some point, causing an electrical short in the power cords and starting the fire. The MarineMax Defendants do not present an alternative explanation for the fire, although they do deny that that the plaintiff has proven his theory. Regardless of the actual cause of the fire, the flames quickly spread, and soon fully consumed Falcone's boat. Mallette's boat, a forty-four foot long motorized yacht, was docked next to Falcone's boat at the time of the fire. The fire spread to Mallette's

boat, and while it did not destroy it, it did substantial damage to the craft. The fire was extinguished later that evening.

Approximately two months after the boat fire, on July 3, 2007, the plaintiff purchased a new boat from the MarineMax Defendants. In purchasing this boat, Mallette signed a "General Release and Agreement in Settlement of All Claims" (the "General Release"). This document stated that Mallette agreed that, in consideration for a 20% discount on the price of his new boat, he would not pursue any claims in connection with the May 9, 2007 fire. Jean Newman, a business manager for the MarineMax Defendants and the salesperson who sold the new boat to Mallette, also executed the General Release. Oddly, the General Release did not state that it was between Mallette and any of the MarineMax Defendants, but rather that it was between Mallette and a fifth corporation, named MarineMax of New York, Inc. Therefore, at least on its face, the General Release did not release any of the MarineMax Defendants. In addition, Mallette maintains that Newman misrepresented the contents of the General Release to him, and that he is unsure that he was given an opportunity to review it before he signed it.

On April 18, 2008, a little less than a year after the boat fire, the plaintiff commenced the present action against the MarineMax Defendants and an entity named Surfside 3 Yacht Clubs, LLC. The Court notes that the defendant Surfside 3 Yacht Clubs has made no appearance in this case, and no default has been sought against it. Against all of the defendants, the plaintiff asserts causes of action for (1) common law negligence, (2) breach of contract, and (3) breach of bailment. In short, the plaintiff claims that the defendants failed to exercise reasonable and appropriate care when they allowed the two power cords to be connected on the swim dock of Falcone's boat, and that this lack of care resulted in the fire that damaged Mallette's boat.

On December 4, 2008, before discovery was complete in the case, the MarineMax Defendants filed their first motion for summary judgment, seeking the dismissal of all of Mallette's claims against them. In making this motion, the MarineMax Defendants asserted, first, that the General Release that Mallette signed on July 3, 2007 barred his claims. In addition, the MarineMax Defendants also relied on a contract Mallette had signed on November 17, 2006 to have "Surfside 3 MarineMax" store his boat for the winter preceding the May 9, 2007 fire (the "Winter Storage Contract"). "MarineMax Surfside 3" was the trade named used by the MarineMax Defendants for the marina they operated in Lindenhurst, New York. The Winter Storage Contract provided, in pertinent part, that:

> It is understood and agreed by [Mallette] that Surfside 3 MarineMax is not responsible or liable for any loss through fire, theft, malicious mischief, personal injury, property damage, vandalism or loss of personal property and equipment whatsoever, and does not carry insurance to cover same, and the lessee agrees to waive his rights of subrogation against SS3 MarineMax.

(Corbett Decl. at Ex. F.) The MarineMax Defendants asserted that this language barred Mallette from asserting any claims against the MarineMax Defendants based on the May 9, 2007 fire.

In *MarineMax I*, the Court denied the MarineMax Defendants' motion for summary judgment, without prejudice to renew after the completion of discovery. 659 F.Supp.2d at 402. In reaching this conclusion, the Court first analyzed the exculpatory language in the Winter Storage Con-

tract, and found that, to the extent that the clause was found to be enforceable and in effect at the time of the fire, its language did cover the type of damage done to Mallette's boat. *Id.* at 400. However, the Court also held that there were genuine issues of fact as to whether the language of the exculpatory clause was conscionable and enforceable, and whether the Winter Storage Contract was still in effect when the May 9, 2007 fire occurred. *Id.* at 400–01. As for the effect of the General Release that Mallette signed on July 3, 2007, the Court similarly found that there were issues of fact as to its meaning and as to Mallette's knowledge and intent in signing it. *Id.* at 401.

After the Court issued *MarineMax I,* the parties proceeded through discovery. On August 27, 2010, Mallette—at that time joined by additional plaintiffs who have since withdrawn their claims—moved for summary judgment against the Marine-Max Defendants on all three of his claims. Three days later, on August 30, 2010, the MarineMax Defendants cross-moved for summary judgment on all three of Mallette's claims. Both motions are opposed.

## II. DISCUSSION

### A. Standard on a Motion for Summary Judgment

It is well-settled that summary judgment under Fed.R.Civ.P. 56(c) is proper only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). A fact is "material" within the meaning of Fed.R.Civ.P. 56 when its resolution "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202

(1986). An issue is "genuine" when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* In determining whether an issue is genuine, "[t]he inferences to be drawn from the underlying affidavits, exhibits, interrogatory answers, and depositions must be viewed in the light most favorable to the party opposing the motion." *Cronin v. Aetna Life Ins. Co.,* 46 F.3d 196, 202 (2d Cir.1995) (citing *United States v. Diebold, Inc.,* 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962) (per curiam), and *Ramseur v. Chase Manhattan Bank,* 865 F.2d 460, 465 (2d Cir.1989)).

Once the moving party has met its burden, "the nonmoving party must come forward with 'specific facts showing that there is a genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (quoting Fed.R.Civ.P. 56(e)). However, the nonmoving party cannot survive summary judgment by casting mere "metaphysical doubt" upon the evidence produced by the moving party. *Matsushita,* 475 U.S. at 586, 106 S.Ct. 1348. Summary judgment is appropriate when the moving party can show that "little or no evidence may be found in support of the nonmoving party's case." *Gallo v. Prudential Residential Servs.,* 22 F.3d 1219, 1223–24 (2d Cir.1994) (citations omitted).

### B. As to the MarineMax Defendants' Motion for Summary Judgment

In renewing their motion for summary judgment on all of the plaintiff's causes of action, the MarineMax Defendants rely on the same grounds asserted in their first motion for summary judgment. Namely, the MarineMax Defendants maintain that both the Winter Storage Contract and the General Release signed by Mallette preclude him from proceeding on his claims in

this case. The Court addresses the effect of each document in turn.

### 1. The Winter Storage Contract

The MarineMax Defendants contend that the parties' fact discovery has shown that the Winter Storage Contract was enforceable and in effect at the time of the boat fire. In response, the plaintiff asserts, to the contrary, that discovery has shown that the Winter Storage Contract was no longer in effect as of May 9, 2007. The plaintiff has apparently abandoned his previous contention that the contract is unconscionable.

In addressing the Winter Storage Contract's term in *MarineMax I,* the Court noted that "the contract provides no clear termination date for 'winter storage,' and thus, questions of fact arise as to the contemplation of the parties and the custom and usage in the industry regarding winter storage agreements." 659 F.Supp.2d at 398. With regard to these questions of fact, discovery has since shown that, on the date that the boat fire occurred, the protective covering placed on Mallette's boat for the winter had already been removed, and the MarineMax Defendants had transported the boat from the marina's storage area to a service area. In addition, the MarineMax Defendants had performed significant work on the boat to prepare it for the summer boating season. However, when the fire occurred, Mallette had not yet retaken possession of his boat.

█ It is the MarineMax Defendants' contention that, because Mallette had not yet retaken possession of his boat on May 9, 2007, the Winter Storage Contract remained in effect, and that it therefore bars his claims based on the boat fire. By contrast, Mallette counters that once the MarineMax Defendants removed his boat from the storage area and began to prepare it for the summer season, the Winter

Storage Contract terminated. In support of this contention, Mallette points out that, for the MarineMax Defendants to prepare his boat for the summer season, he must request this and pay for it separately from the Winter Storage Contract.

As the Court stated in *Mallette I,* the language of the Winter Storage Contract on this issue is ambiguous, and the Court must therefore look to extrinsic evidence of the contract's meaning. *See, e.g., Diesel Props S.r.l. v. Greystone Business Credit II LLC,* 631 F.3d 42 (2d Cir.2011) ("When the district court as factfinder is confronted with a contract provision that is not unambiguous, it may properly consider evidence extrinsic to the contract, including testimony offered by the parties."). Thus, taking the relevant extrinsic evidence in the best light for the non-moving party—in this instance, Mallette—the Court finds that there are genuine issues of fact as to whether the Winter Storage Contract was still in effect on May 9, 2007. The Court reaches this conclusion based not only on Mallette's testimony that he understood that the Winter Storage Contract ended when the marina began servicing his boat, but also based on testimony from an operations manager for the MarineMax Defendants, Jennifer Hodnik, suggesting that Mallette's understanding may have been shared by the MarineMax Defendants. (See Hodnik Depo. at 35:15–18, 38:16–19; 41:21–42:5.) The Winter Storage Contract therefore cannot provide a basis for a grant of summary judgment in the favor of the MarineMax Defendants.

### 2. The General Release

The MarineMax Defendants' second basis for seeking summary judgment in their favor is the General Release that Mallette signed on July 3, 2007. However, this document also presents genuine issues of fact as to its effect in this case.

■ First, the General Release—which is drafted as a formal contract document—is on its face a contract between Mallette and MarineMax of New York, Inc., and not a contract between Mallette and any of the named defendants. To be sure, the document was executed by an agent of the MarineMax Defendants, but the fact that the contract does not name any of the MarineMax Defendants renders it sufficiently ambiguous to require a factual inquiry as to the intent and knowledge of the parties. The evidence from the parties in this regard is contradictory, and particularly in light of the fact that the General Release was drafted by the MarineMax Defendants, the Court cannot at the summary judgment stage resolve this dispute in favor of the MarineMax Defendants. *See, e.g., McCarthy v. American Intern. Group, Inc.*, 283 F.3d 121, 124 (2d Cir. 2002) ("New York follows the well established *contra proferentem* principle which requires that 'equivocal contract provisions are generally to be construed against the drafter.'") (quoting *Revson v. Cinque & Cinque, P.C.*, 221 F.3d 59, 67 (2d Cir. 2000).)

■ Second, the plaintiff maintains that Jean Newman, the representative of the MarineMax Defendants who sold him his new boat, misrepresented the contents of the General Release. (Mallette Depo. at 35:3–12.) Taking this testimony in the best light for the plaintiff, this, too, supports a denial of the MarineMax Defendants' request for summary judgment based on the General Release.

The Court notes that the parties also both raised an additional issue, concerning how Mallette's recovery from his insurance company for the damage to his boat affects the General Release and his right to pursue claims against the MarineMax Defendants. While this issue does not affect the outcome of this motion, the Court will briefly address it for the sake of clarity.

By way of background, prior to the May 9, 2007 fire, Mallette had insured his boat with a company called Axis Reinsurance Company ("Axis Insurance"). After the fire, the plaintiff settled his claim for damages with Axis Insurance for $244,226. Then, on the same day that Mallette purchased his new boat, July 3, 2007, Axis Insurance sent a letter to the MarineMax Defendants stating that, in light of the fact that it had settled Mallette's insurance claim, it intended to pursue Mallette's claims against the MarineMax Defendants as Mallette's subrogee. It is unclear how this letter was transmitted or when the MarineMax Defendants received it, and it does not appear that Axis Insurance has to date directly asserted any claims against the MarineMax Defendants. Nevertheless, in the present case, Mallette asserts that, because the MarineMax Defendants allegedly knew at the time that the General Release was signed that Axis Insurance intended to pursue claims as subrogee, the MarineMax Defendants may not rely on the General Release to protect them from *Mallette's* claims.

■ This argument turns the law of subrogation on its head. If anything, the New York law of subrogation suggests that, once a party has been compensated by an insurer for property damage, that party may not seek the same recovery from the person who caused that damage. *See Winkelmann v. Excelsior Ins. Co.*, 85 N.Y.2d 577, 581, 650 N.E.2d 841, 626 N.Y.S.2d 994 (N.Y.1995) ("Subrogation . . . has a dual objective. It seeks, first, to prevent the insured from recovering twice for one harm, as it might if it could recover from both the insurer and from a third person who caused the harm. . . ."). To be sure, when a tortfeasor is aware of an insurer's intention to pursue an insured's

claims as a subrogee, the tortfeasor may not avoid those subrogation claims by later obtaining a release of claims from the insured. *See Gibbs v. Hawaiian Eugenia Corp.,* 966 F.2d 101, 105–07 (2d Cir.1992) ("Where a third party obtains a release from an insured with knowledge that the latter has already received payment from the insurer or with information that, reasonably pursued, should give him knowledge of the existence of the insurer's subrogation rights, such a release does not bar the right of subrogation of the insurer."). However, this rule speaks only to the validity of claims brought by Mallette's insurer. The claims before the Court are not brought by Mallette's insurer, but by Mallette himself. Thus, the issues briefed by the parties concerning Axis Insurance's intent to subrogate are not relevant to the present case.

The Court does note that Mallette maintains that he did not recover the full assessed value of the damage to his boat from his insurer. Thus, to the extent that the law of subrogation limits his recovery in this case—and the Court now makes no finding on that issue—this would affect only the damages Mallette may recover from the MarineMax Defendants, and not the validity of his cause of action.

Therefore, having reviewed the MarineMax Defendants' bases for summary judgment, the Court finds that they are without merit, and denies the MarineMax Defendants' motion for summary judgment in its entirety.

## C. As to the Plaintiff Mallette's Motion for Summary Judgment

Mallette, also, seeks summary judgment in his favor on all of his causes of action, which, again, are for (1) common law negligence, (2) breach of contract, and (3) breach of bailment. Although each of these causes of action has unique elements, the plaintiff's theory in asserting all three causes of action is that (1) the MarineMax Defendants owed him a duty to exercise reasonable care in holding his property—whether originating in tort law, a contract between the parties, or the MarineMax Defendants' duty as bailees—and (2) the MarineMax Defendants failed to exercise the appropriate level of care. The MarineMax Defendants generally assert that they acted with sufficient care, and specifically maintain that there are at least triable issues of fact suggesting that the Winter Storage Contract and the General Release bar the plaintiff's claims. Ultimately, the Court finds that there are triable issues of fact regarding the Winter Storage Contract and the General Release that bar summary judgment in the plaintiff's favor, as well as triable issues of fact as to whether the MarineMax Defendants exercised an appropriate level of care with regard to the plaintiff's boat.

### 1. As to the Winter Storage Contract

Consistent with their motion for summary judgment, the MarineMax Defendants assert that the Court should find that there are triable issues of fact as to whether the Winter Storage Contract bars the plaintiff's present claims. The Court agrees. As discussed in detail above, the language of the Winter Storage Contract is ambiguous, and taking the facts in the best light for the non-movant—now the MarineMax Defendants—the Court finds that a reasonable finder of fact could conclude that the Winter Storage Contract was still in effect on the date of the boat fire, and that it precludes the plaintiff's claims. The Court therefore denies the plaintiff's summary judgment motion on this basis.

### 2. As to the General Release

Similarly, the Court finds that there are triable issues of fact as to the enforceabili-

ty of the General Release, and that this precludes the plaintiff's request for summary judgment relief. In the Court's view, a reasonable fact finder could deem the General Release to be a contract between the plaintiff and the MarineMax Defendants, particularly in view of the fact that the contract was signed by a representative of the MarineMax Defendants and provided for a 20% price reduction on the boat that the plaintiff was purchasing from the MarineMax Defendants. In addition, the Court finds that a reasonable fact finder could conclude that, in spite of the plaintiff's testimony that the MarineMax Defendants misrepresented the contents of the General Release to him, the General Release is enforceable as written and bars the plaintiff's present claims. The Court therefore denies summary judgment on this basis as well.

### 3. As to the Merits of the Plaintiff's Causes of Action

Finally, the Court notes that there are also genuine issues of material fact as to the merits of the plaintiff's causes of action. To be sure, the MarineMax Defendants have not presented evidence that contradicts the plaintiff's theory as to the cause of the boat fire. However, the evidence of the source of the fire does not compel the conclusion that the MarineMax Defendants breached a duty of care that they owed to the plaintiff in tort law, under whatever contract was in effect, or as a bailee.

■ In arguing to the contrary, the plaintiff relies on the doctrine of *res ipsa loquitur*—literally, "the thing speaks for itself"—to conclude that the damage to his boat must have been the result of negligence. Generally, to prove negligence under the doctrine of *res ipsa loquitur*, a plaintiff must show:

(1) the event [causing damage] was of a kind which ordinarily does not occur in the absence of someone's negligence;

(2) it was caused by an agency or instrumentality within the exclusive control of the defendant; and

(3) it was not due to any voluntary action or contribution on the part of the plaintiff.

*St. Paul Fire & Marine Ins. Co. v. City of New York,* 907 F.2d 299, 302 (2d Cir.1990). However, New York courts have repeatedly cautioned that only "in the rarest of res ipsa loquitur cases may a plaintiff win summary judgment or a directed verdict." *Morejon v. Rais Const. Co.,* 7 N.Y.3d 203, 209, 851 N.E.2d 1143, 818 N.Y.S.2d 792 (N.Y.2006); *Tora v. GVP AG,* 31 A.D.3d 341, 342, 819 N.Y.S.2d 730 (1st Dep't 2006); *Shinshine Corp. v. Kinney System, Inc.,* 173 A.D.2d 293, 294, 569 N.Y.S.2d 686 (1st Dep't 1991).

■ This is not one of the rare cases where summary judgment would be appropriate based on the doctrine of *res ipsa loquitur.* To be sure, the plaintiff has presented largely unchallenged evidence that the boat fire started at the connection between two power cords at the back of the boat docked next to Mallette's yacht. However, there is insufficient evidence to *require* the conclusion that the conditions that lead to the fire were unusual or the result of carelessness. In the Court's view, it is a question for the jury as to whether the Defendants breached a duty of care with regard to the conditions that lead to the boat fire. The Court therefore denies summary judgment on these grounds as well.

### D. As to the Defendant Surfside 3 Yacht Clubs, LLC

The Court previously noted that one of the named defendants, Surfside 3 Yacht Clubs, LLC ("Surfside 3") has made no

appearance in this case, and the plaintiff has not sought a default judgment against this party. It is presently unclear to the Court whether Surfside 3 in fact continues to exist, or whether the plaintiff wishes to pursue any claims against this entity. The Court therefore directs the plaintiff to respond within twenty days of the date of this Order, indicating whether he seeks to prosecute his claims against Surfside 3. If the plaintiff does not respond within this period, the Court will dismiss the plaintiff's claims against Surfside 3 with prejudice for failure to prosecute.

## III. CONCLUSION

For the foregoing reasons, it is hereby

**ORDERED** that the MarineMax Defendants' motion for summary judgment is denied in its entirety; and it is further

**ORDERED** that the plaintiff's motion for summary judgment is denied in its entirety; and it is further

**ORDERED** that the plaintiff is directed to inform the Court within twenty days of the date of this Order whether it seeks to assert claims against the defendant Surfside 3 Yacht Clubs, LLC; and it is further

**ORDERED** that the parties are directed to appear before the Court on Thursday, May 5, 2010 at 10:00 a.m. to discuss settlement and/or to schedule a date for trial.

**SO ORDERED.**